# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| HUSKY HEATING & COOLING, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BOSCH LLC, ROBERT BOSCH GMBH, JC RESIDENTIAL AND LIGHT COMMERCIAL LLC, JOHNSON CONTROLS HITACHI AIR CONDITIONING NORTH AMERICA LLC, TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO. (U.S.), INC., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, DAIKIN APPLIED AMERICAS, THERMALNETICS, LLC, LENNOX INTERNATIONAL, INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, RHEEM MANUFACTURING CO., HEAT TRANSFER PRODUCTS GROUP, LLC, AAON, INC., a Nevada Corporation, AAON, INC., an Oklahoma Corporation, AAON COIL PRODUCTS, INC., and BASX, INC.,<br><br> Defendants. | Case No. 26-CV-<br><br>Hon. Susan K. DeClercq<br>Mag. Anthony P. Patti<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

| | |
|---|---|
| RICHARD ISOM, individually and on behalf of all others similarly situated, | Case No. 26-CV-11294 |
| Plaintiff, | Hon. Susan K. DeClercq<br>Mag. Anthony P. Patti |
| v. | |
| ROBERT BOSCH, LLC, et al. | |
| Defendants. | |
| PRECISION PLUMBING, ELECTRIC, HEATING & COOLING INC., individually and on behalf of all others similarly situated, | Case No. 26-CV-11316 |
| Plaintiff, | Hon. Susan K. DeClercq<br>Mag. Anthony P. Patti |
| v. | |
| ROBERT BOSCH, LLC, et al. | |
| Defendants. | |
| RELIABLE AC SERVICES LLC, Individually and on Behalf of All Others Similarly Situated, | Case No. 26-CV-11434 |
| Plaintiff, | Hon. Susan K. DeClercq<br>Mag. Anthony P. Patti |
| v. | |
| TRANE TECHNOLOGIES PLC, et al. | |
| Defendants. | |

1027557.1

2

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ...........................................................................6

PARTIES...............................................................................................................9

    A.    PLAINTIFF ...........................................................................................9

    B.    DEFENDANTS......................................................................................9

        1.  Bosch Defendants ........................................................................9

        2.  Trane Defendants ......................................................................11

        3.  Carrier Defendants ...................................................................13

        4.  Daiken Defendants....................................................................14

        5.  Lennox Defendants ...................................................................16

        6.  Rheem Defendants ...................................................................16

        7.  AAON Defendants ...................................................................16

AGENTS AND CO-CONSPIRATORS ..............................................................21

FACTUAL ALLEGATIONS ..............................................................................23

    A.    Background on HVAC Equipment .........................................................23

        Types of HVAC Equipment....................................................................23

        Residential HVAC Equipment................................................................23

        Commercial HVAC Equipment ..............................................................25

    B.    HVAC Equipment Market Structure.......................................................28

    C.    Pricing in the HVAC Equipment Industry .............................................29

    D.    Overview of the HVAC Equipment Manufactured by Each
        Defendant ................................................................................................29

    E.    The Air-Conditioning, Heating, and Refrigeration Institute...............31

        a. Pre-2020: Relativity Stable Pricing That Tracked the CPI and
        Household Appliance PPI .......................................................................36

        b. 2020: The Onset of the COVID-19 Pandemic and the
        Phasedown of HFCs Under the AIM Act Provided the Perfect
        Opportunity and Pretext for the Conspiracy to Succeed....................37

c. 2021: The Conspiracy Gathers Steam .........................................40

d. 2022: The Conspiracy Takes Off .................................................44

e. 2023: The Conspiracy Hits Its Stride .........................................46

f. 2024: Defendants Maintain Their Conspiracy............................49

g. 2025: Defendants Keep the Price Increases Coming and Publicly Embrace "Price Discipline"................................................50

h. 2026: Lennox's CFO: "The industry's generally been disciplined for the past several years ... we're gonna continue to increase our pricing" ...............................................................54

OTHER ASPECTS OF THE CONSPIRACY SUPPORT ITS PLAUSIBILITY.................................................................................................57

A. Defendants' Record Profits Demonstrate the Conspiracy's Success ...........................................................................................57

B. Preliminary Regression Analysis Supports Anticompetitive Harm to the Price of HVAC Equipment Caused by the Conspiracy......................................................................................58

C. Plus Factors Support the Plausibility of Defendants' Conspiracy ......61

1. There are no close substitutes for HVAC Equipment....................61

2. The demand for HVAC Equipment is inelastic ............................62

3. The HVAC Equipment industry is highly concentrated and consolidated...................................................................................63

4. The HVAC Equipment industry has high barriers to entry ..........65

5. HVAC Equipment is largely commoditized .................................66

6. Defendants had numerous opportunities to collude......................68

a. The Air-Conditioning, Heating, and Refrigeration Institute......68

b. Other industry conferences .......................................................71

c. ACHR News..............................................................................72

d. HARDI. .....................................................................................72

DEFENDANTS FRADULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY.................................................................................73

CLASS ACTION ALLEGATIONS ..............................................................................78

DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST
VIOLATION ....................................................................................................82

PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED
THROUGH REASONABLE DILIGENCE THE CLAIMS IN THIS
LAWSUIT EARLIER ......................................................................................83

DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY
.........................................................................................................................84

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ....................85

CLAIMS FOR RELIEF ........................................................................................86

Plaintiff Husky Heating & Cooling LLC brings this civil antitrust action on behalf of itself individually and on behalf of a proposed Class of all entities and persons who directly purchased HVAC Equipment[1] in the United States from at least as early as January 1, 2020 through the present (the "Class Period") from one or more of Defendants and their co-conspirators.

## I. <u>INTRODUCTION</u>

1.      On behalf of a proposed class of thousands of entities and persons nationwide, Plaintiff brings this class action to put an end to Defendants' illegal scheme, to recover damages, and to restore competition in the HVAC Equipment marketplace.

2.      Since at least January 1, 2020, Defendants—the largest manufacturers of HVAC Equipment sold in the United States—have conspired to fix, raise, maintain, and stabilize the prices of HVAC Equipment throughout the United States. During this period, HVAC Equipment prices increased by more than 50%, greatly outpacing inflation and the rate at which comparable goods increased, despite historical data showing that those figures had previously moved within similar ranges.

---

1 "HVAC" refers to Heating, Ventilation, and Air Conditioning. "HVAC Equipment" means the pieces and parts, separately, but also in their combined form, that work together in commercial, residential, or industrial ducted systems to control indoor temperature, humidity, and air quality. This includes, but is not limited to, air conditioning units, heat exchangers, thermostats, blower motors, air ducts and vents, furnaces, evaporator and condenser coils, refrigerants, fans, compressors, and expansion valves.

3. Defendants repeatedly attempted to justify these increases through a series of pretextual explanations, including supply chain disruptions caused by the COVID-19 pandemic, changes to federal energy efficiency standards, and the phasedown of hydrofluorocarbons ("HFCs") under the American Innovation and Manufacturing ("AIM") Act of 2020. None of these explanations justified the magnitude, timing, or coordinated nature of Defendants' price increases.

4. Indeed, the HVAC Producer Price Index rose substantially faster than both the Consumer Price Index and the Producer Price Index for major household appliances during the Class Period, demonstrating that HVAC Equipment pricing diverged sharply from broader economic and manufacturing trends. Defendants' conduct widened the spread between the cost to manufacture HVAC Equipment and the prices at which Defendants sold those products, resulting in supracompetitive profits.

5. The truth behind Defendants' coordinated conduct began coming into focus in 2026, when senior executives openly acknowledged the industry's pricing discipline and coordinated approach to maintaining margins. During a January 29, 2026, earnings call, Trane's CEO announced that the company had "reduced factory production days by one-third" in order "to normalize residential inventory," while simultaneously assuring investors that "pricing is [not] coming down in that market."

6. On the following day, January 30, 2026, Lennox's CEO stated that,

2

"[b]ased on everything we have seen so far, we see our competitors aiming at similar price increases." On February 4, 2026, Daikin's President similarly stated, "We are not increasing our market share by lowering our selling prices," and the next day Carrier's CEO declared, "We have no intent of losing any share while maintaining price." Less than three weeks later, Lennox's Chief Financial Officer ("CFO"), Michael Quenzer ("Quenzer"), further explained that competing on price "does not win market share," that the industry had "generally been disciplined for the past several years," and that Lennox intended to continue "increas[ing] [its] pricing to maintain [its] margins" because "others have generally been as well." These are not the statements of firms engaged in vigorous competition; rather, they are the public signals of conspirators communicating adherence to a coordinated scheme to fix prices and restrict competition.

7.      Defendants were able to engage in this coordinated conduct because the HVAC Equipment market is highly concentrated, standardized, and conducive to collusion. Defendants—Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON (collectively, "Defendants")—collectively control more than 90% of the HVAC Equipment market in the United States.

8.      HVAC Equipment consists of standardized, mass-produced products sold primarily on the basis of price, including air conditioner condensers, heat pumps, furnaces, air handlers, rooftop units, split systems, chillers, and variable

refrigerant flow systems. The market is characterized by limited product differentiation, stable and predictable demand, high barriers to entry, and longstanding regulatory standards governing manufacturing and efficiency requirements.

9.     HVAC Equipment is also a necessity for residential and commercial buildings, providing heating, cooling, ventilation, humidity control, and air quality management. Consumers and businesses often have little choice but to purchase replacement systems despite rapidly increasing prices, particularly because HVAC systems are expensive and infrequently purchased products that frequently require financing. As one industry participant admitted in July 2021 while prices were rapidly increasing, "I don't think there's been much pushback from the consumer at all . . . . The consumer doesn't know what the—what a price is. It's not a frequent purchase for the consumer."

10.     Defendants implemented and facilitated their conspiracy through extensive information sharing, coordinated communications, and public signaling. Defendants used the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), a trade association largely controlled by Defendants, to exchange competitively sensitive information through "give-to-get" data programs that required participants to provide confidential and proprietary business information in exchange for access to industry-wide data and competitive intelligence.

4

11. Defendants used this information to monitor market conditions, coordinate pricing strategies, and align production decisions. Defendants also used Air Conditioning, Heating & Refrigeration ("ACHR") News, a specialized HVAC trade publication, to publicly announce price increases and signal future pricing and supply intentions to competitors and the broader market. Through repeated information exchanges, public statements, supply reductions, and coordinated pricing announcements, Defendants successfully decoupled HVAC Equipment prices from underlying manufacturing costs and maintained artificially inflated prices throughout the Class Period.

12. Defendants further reinforced the conspiracy by coordinating supply restrictions when demand softened, thereby ensuring that lower sales volumes would not lead to lower prices. Under normal competitive market conditions, manufacturers reducing production would risk losing customers to rivals offering lower prices or greater supply. That did not occur here because Defendants understood that their competitors would not exert downward price pressure or compete aggressively for market share. Instead, Defendants collectively maintained elevated prices while restricting output, preserving supracompetitive margins across the industry.

13. Plaintiff and members of the Class are entities and persons who directly purchased HVAC Equipment in the United States from at least as early as January

1, 2020, through the present from one or more of Defendants and their co-conspirators.

14.     Defendants in this case are the leading manufacturers of HVAC Equipment in the United States: Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON. These seven Defendants control over 90% of the market for HVAC Equipment in the United States.

## II.  <u>JURISDICTION AND VENUE</u>

15.     Plaintiff brings this antitrust class action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to restrain Defendants' continuing violation and to recover treble damages and the costs of suit, including reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class, and for such other relief afforded under the laws of the United States for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

16.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

17.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d)

engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

18.     This Court has personal jurisdiction over all Defendants pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15. U.S.C. § 22, which authorizes nationwide service of process and confers personal jurisdiction over a defendant who has sufficient minimum contacts with the United States as a whole. When Congress has enacted such a nationwide service of process statute, personal jurisdiction exists whenever the defendant has sufficient minimum contacts with the United States to satisfy the Fifth Amendment's due process requirements. Exercising personal jurisdiction over a defendant is proper under the Fifth Amendment Due Process Clause when, as here, the defendant and the conduct at issue bear a meaningful relationship to the United States. Defendants have a meaningful relationship with the United States through their or their subsidiaries' operation in the country and their sale of HVAC Equipment throughout the United States. The United States and its courts, including this Court, have a clear interest in adjudicating anticompetitive conduct occurring in the United States that affects United States commerce and United States businesses and consumers. Defendants are sophisticated and substantial organizations with United States facilities or subsidiaries and have operations in this country, making it fair for them to litigate in this District.

19. Alternatively, the Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed HVAC Equipment into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Defendants imposed unlawful overcharges for HVAC Equipment and caused antitrust injury within this jurisdiction. Defendants' antitrust conspiracy was and is directed at Plaintiffs and members of the Class, and had and has the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

20. Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed Class Members.

21. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial

8

portion of the affected interstate commerce described herein was carried out in this District.

22.    The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

23.    No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.  PARTIES

### A.    PLAINTIFF

24.     Plaintiff Husky Heating & Cooling LLC ("Husky Heating & Cooling" or "Plaintiff Husky Heating & Cooling") is a citizen of Arkansas as it is an Arkansas corporation with its principal place of business in Conway, Arkansas. During the Class Period, Plaintiff Husky Heating & Cooling purchased HVAC Equipment directly from one or more of the Defendants at artificially inflated prices.  Husky Heating & Cooling suffered an antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.    DEFENDANTS

#### 1.    Bosch Defendants

25.    Defendant Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH and serves as the corporate headquarters for North America. It is

9

located in this District, in Farmington Hills, Michigan.

26. Defendant Robert Bosch GmbH is a publicly traded corporation headquartered and incorporated in Gerlingen, Baden-Wurttemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are located in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several different brands and product lines, including Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

27. Defendant JC Residential and Light Commercial LLC ("JC RLC") is a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan. JC RLC was acquired by Robert Bosch GmbH in 2024 from Johnson Controls International plc's Residential and Light Commercial HVAC business in an all-cash transaction valued at $8.1 billion.

28. Defendant Johnson Controls-Hitachi Air Conditioning North America LLC ("JCH North America") is a subsidiary of Robert Bosch GmbH. JCH North America was acquired by Robert Bosch GmbH; it was formerly a joint-venture

10

between Johnson Controls and Hitachi Global Life Solutions, Inc. JCH North America remains a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan.

29. This Complaint refers to Defendants Robert Bosch GmbH, Robert Bosch LLC, JC RLC, and JCH North America are referred to collectively as "**Bosch**" or the "**Bosch Defendants**" in this Complaint. The Bosch Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Bosch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Bosch supplied HVAC Equipment to distributors, including Johnstone Supply, which has many locations in this District, including in Detroit, Ann Arbor, Farmington Hills, Flint, Kalamazoo, and many others.

### 2.    Trane Defendants

30. Defendant Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane Technologies' North American and United States headquarters are located in Davidson, North Carolina. Trane Technologies manufactures and markets HVAC

11

Equipment under several different brands and product lines, including Trane, American Standard, RunTru, Ameristar, Oxbox, and others. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Trane Technologies' common stock is listed and traded on the New York Stock Exchange under the ticker symbol "TT." Trane Technologies was acquired by Ingersoll Rand Inc. in 2008 for $10.1 billion. Ingersoll Rand Inc. Kept it as a subsidiary and then spun it off into a dedicated climate control company in March 2020. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and Livonia, Michigan. Trane Technologies also operates an HVAC Equipment commercial manufacturing operation in Grand Rapids, Michigan. Indeed, Trane Technologies' website indicates that it has over 40 "Trane HVAC Dealer" locations in the State of Michigan. Defendant Trane U.S. Inc. is a manufacturer of HVAC systems, building management controls, and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies plc, and according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan. Trane U.S. Inc. is a Delaware corporation that is headquartered in Davidson, North Carolina.

31.     Defendant Mitsubishi Electric Trane HVAC US is a 50/50 joint ven

ture between Trane Technologies plc and Mitsubishi Electric US, Inc. that was created in 2018. It distributes products under the Mitsubishi Electric brand and Trane and American Standard branded systems. Mitsubishi Electric Trane HVAC US is a Delaware limited liability company that is headquartered in Suwanee, Georgia.

32. This Complaint refers to Defendants Trane Technologies, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US collectively as "**Trane**" or the "**Trane Defendants**." The Trane Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Trane supplied HVA C Equipment to distributors, including in the State of Michigan and in this District.

### 3.   Carrier Defendants

33. Defendant Carrier Global Corp. ("Carrier Global") is a Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier is a publicly traded company whose common stock is listed and traded on the New York Stock Exchange under the ticker symbol "CARR." Carrier Global manufactures and markets HVAC Equipment under product lines and brands that include Carrier,

Airquest, Arcoaire, Beretta, Bryant, Toshiba, Payne, Tempstar,  Comfortmaker, Heil, Keeprite, Day & Night, Viessmann, and others. Carrier Global operates a commercial servicer for HVAC Equipment in Novi, Michigan. Indeed, its website includes a page identifying over 100 locations in the State of Michigan, entitled "Find a Carrier Expert – Michigan."

34. Defendant Viessmann Manufacturing Co. (U.S.), Inc. is part of the Viessmann Climate Solutions entity acquired by Carrier in 2024 and was Viessmann's primary manufacturing and distribution facility in the United States. It is now a subsidiary of Carrier and is located in Warwick, Rhode Island. Carrier, as used herein, includes Viessmann Manufacturing Co. (U.S.), Inc.

35. This Complaint refers to Defendants Carrier Global Corp. and Viessmann Manufacturing Co. (U.S.), Inc. collectively as "**Carrier**" or the "**Carrier Defendants**." The Carrier Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, Carrier and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Carrier supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 4. **Daiken Defendants**

14

36.     Defendant Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan, with United States corporate headquarters in New York, New York. In 2022, Daikin acquired ThermalNetics, an HVAC Equipment sales and services provider that is headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several different product lines and brands, which include Daikin, Amana, Goodman, and others. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

37.     Defendant Daikin Comfort Technologies North America, Inc. is a subsidiary of Daikin Industries, Ltd., based in Waller, Texas. Daikin Comfort Technologies North America, Inc. engineers, manufactures, markets, and sells HVAC Equipment under several brand and product lines including Daikin, Goodman, Quietflex, and Amana. This activity is done at its "Daikin Texas Technology Park" outside Houston, Texas, Daikin Industries, Ltd.'s United States subsidiary is known as Daikin Comfort Technologies North America, Inc. (Goodman Global Group, Inc. prior to April 2022).

38.     Defendant Daikin Applied Americas is a subsidiary of Daikin Industries, Ltd., headquartered in Minneapolis, Minnesota. Daikin Applied

Americas manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

39. Defendant ThermalNetics, LLC is a subsidiary of Daikin Industries, Ltd., based in Auburn Hills, Michigan. ThermalNetics manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

40. This Complaint refers to Defendants Daikin Industries, Ltd., Daikin Comfort Technologies North America, Daikin Applied Americas, and ThermalNetics, LLC collectively as "**Daikin**" or the "**Daikin Defendants**." The Daikin Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Daikin supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 5. Lennox Defendants[2]

41. Defendant Lennox International, Inc. ("Lennox International") is a

---

[2] While not named as a Defendant, Advanced Distributor Products LLC ("ADP") is a wholly owned subsidiary of Heatcraft Inc., which is itself a subsidiary of Lennox International, Inc. ADP is a Delaware limited liability company headquartered in Stone Mountain, Georgia. ADP manufactures and markets HVAC Equipment under the ADP brand and several product lines.

publicly traded Delaware corporation headquartered in Richardson, Texas. Lennox's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "LII." Lennox International, either itself or by/through its subsidiaries, operates stores selling its HVAC Equipment products in Livonia and Madison Hights, Michigan. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

42.     Defendant Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

43.     Defendant Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries, Inc. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures and markets HVAC Equipment under several different brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

44.     This Complaint refers to Defendants Lennox International, Lennox Industries, and Allied Air collectively as "**Lennox**" or the "**Lennox Defendants**."

17

The Lennox Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Lennox and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Lennox supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 6.      **Rheem Defendants**

45.    Defendant Rheem Manufacturing Co. is a privately-owned manufacturer headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment services in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial markets for HVAC Equipment in the 1970s when it acquired Acme Industries, which was headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in 1988. Rheem Manufacturing Co. manufactures and markets HVAC Equipment under several different brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, and others. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

46.    Defendant Heat Transfer Products Group, LLC is a manufacturer of

18

commercial HVAC Equipment sold under brands such as Russell, Witt, Kramer, and ColdZone. HTPG is a division of Rheem Manufacturing Co., and is headquartered in Lawrenceville, Georgia.

47.     Defendants Rheem Manufacturing Co. and Heat Transfer Products Group, LLC are referred to collectively as "**Rheem**" or the "**Rheem Defendants**" in this Complaint. The Rheem Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Rheem and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Rheem supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 7.     AAON Defendants

48.     Defendant AAON, Inc. ("AAON, Inc. (Nevada)") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON's common stock is listed and traded on NASDAQ under the ticker symbol "AAON." AAON manufactures and markets primarily commercial HVAC Equipment, including rooftop units, air handling units, chillers, and condensing units. Airtech Equipment is the primary authorized representative for AAON HVAC Equipment in Michigan, with offices both in this District in Detroit, as well as in Grand Rapids. During the

19

Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

49.     Defendant AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON Inc. entity referenced above in the immediate prior paragraph. AAON, Inc. (Oklahoma) is incorporated in Oklahoma and AAON, Inc. Oklahoma engineers, manufactures, and sells highly configurable HVAC systems.

50.     Defendant AAON Coil Products, Inc. is a Texas corporation and subsidiary of AAON, Inc. AAON Coil Products, Inc. engineers and manufactures semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

51.     Defendant BASX, Inc. is an Oregon corporation and subsidiary of AAON, Inc. BASX engineers, manufactures, and sells a wide-range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

52.     This Complaint refers to Defendants AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc. collectively as "**AAON**" or the "**AAON Defendants**" in this Complaint. The AAON Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, AAON

and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, AAON supplied HVAC Equipment to distributors, including in the State of Michigan and this District.

### IV. AGENTS AND CO-CONSPIRATORS

54. Defendants' acts were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business affairs.

55. Co-Conspirator Air-Conditioning, Heating, and Refrigeration Institute is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. AHRI is based in Arlington, Virginia. As alleged elsewhere herein, AHRI, at a minimum, facilitated the conspiracy alleged herein, and moreover, AHRI's Board of Directors is comprised of, in substantial part, executives of several Defendants, as detailed infra. Further investigation and access to discovery will provide more clarity on the full scope of AHRI's role in the conspiracy

56. Various other persons, firms and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and

21

severally liable for the acts of their Co-conspirators, whether or not the Co-conspirators are named as Defendants in this Complaint.

57.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

58.    Each Defendant named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

59.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Defendants' conspiracy involved Defendants' reliance that other corporate families would act consistently with their agents' statements about prices and production. Because Defendants operate and market themselves as corporate families, individual participants in the conspiratorial acts did not often know or identify the corporate affiliations of themselves or their counterparts, nor did they recognize the technical distinction between the entities within a corporate family.

Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to raise and maintain supra-competitive prices of HVAC Equipment.

60.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.  FACTUAL ALLEGATIONS

### A.     Background on HVAC Equipment

61.     Plaintiff alleges that Defendants entered into an agreement from at least as early as January 1, 2020, through the present to exchange price signaling statements and competitively sensitive information with the purpose of coordinating supracompetitive prices for HVAC Equipment and effect of generating historic profit margins.

#### a.  Types of HVAC Equipment

#### i.      Residential HVAC Equipment

62.     Residential HVAC Equipment refers to HVAC systems designed for residential applications. These systems are generally smaller and less complex than commercial HVAC systems and commonly utilize a "split" configuration consisting of one indoor unit and one outdoor condenser.

63.     Residential HVAC Equipment includes systems that regulate indoor temperature, humidity, and air quality in homes. Key components of residential

23

HVAC systems include furnaces, heat pumps, air conditioners, and air handlers. These work, often together, to move heated or cooled air throughout the home via ductwork.

64.     Residential heating equipment includes furnaces (which use gas, oil, or electricity) and heat pumps, which provide heat by transferring warmth from the air. Residential cooling equipment, as well as heat pumps, remove heat and humidity from indoor air, releasing it outside.

65.     Air handlers, with blower motors, push conditioned air through ducts. Ductwork and venting distribute air throughout the home. Residential HVAC systems often include air quality components, such as filters that remove particulates, and systems like dehumidifiers or humidifiers to balance moisture levels.

66.     There are three primary types of residential HVAC systems: (1) split systems, which have separate indoor (furnace/air handler) and outdoor (condenser) components; (2) packaged units, where all components are combined into one outdoor unit (often used in homes without basements); and (3) ductless "mini-splits," which are individual units for cooling/heating specific rooms without needing ductwork. Ductless "mini-splits" are not included in the product definition in this case.

ii.     **Commercial HVAC Equipment**

67.    Commercial HVAC Equipment generally involves more complex operational requirements than residential HVAC systems, including the ability to regulate different temperatures across multiple rooms, zones, or offices within a building. These systems are designed for high-capacity heating and cooling and are often configured as modular rooftop units that integrate both heating and cooling functions, enabling multiple units to operate within a single structure, such as apartment complexes, hotels, office buildings, and data centers.

68.    Most manufacturers offer rooftop HVAC units ("RTUs"), which are designed exclusively for commercial applications. RTUs are commonly installed on retail stores, restaurants, strip malls, and similar light commercial properties. These self-contained, "all-in-one" systems are typically mounted on rooftops and provide integrated heating, cooling, and ventilation for smaller commercial buildings. For example, Lennox International markets rooftop units for commercial applications, as do Daikin Industries and Bosch through its acquisition of Johnson Controls and the York brand.

69.    A typical commercial rooftop system is a self-contained system that bundles all the main refrigeration, air-moving, heating, and control components in one cabinet. The parts consist of refrigeration (compressor, condenser coil, condenser fan, expansion device, and evaporator coil). There is also an air-handling section (fan, return-air path, outdoor-air intake hood, and air filters) as well as a

25

heating unit. There are also controls and safety devices such as thermostats, sensors, and control boards.

70. As an alternative to a rooftop unit, Defendants also offer ducted and split systems. These are separate indoor and outdoor units connected by ducts that can be built into ceilings, boiler rooms, or utility closets in offices and other commercial buildings. These combine an outdoor condensing unit with an indoor air handler, running through ducts rather than as a single rooftop box. These include Bosch's commercial "split systems," Daikin's commercial split heat pumps, Carrier's "Split Systems and Air-Cooled Condensers," Lennox's commercial mini-split systems, and Rheem's "Split Air Conditioners."

71. A typical commercial split system has two main pieces: an outdoor condensing unit and an indoor air handler, connected by refrigerant lines. The outdoor unit houses the compressor, condenser coil, and outdoor fan, while the indoor unit contains the evaporator coil, supply fan/blower, and air filter.

72. For larger buildings, Defendants offer some form of multi-zone heat pump system. This includes variable refrigerant flow ("VRF") systems for offices, hotels, and other large commercial buildings. These systems offer room-by-room control and are refrigerant-only, connecting many indoor units to one or more outdoor devices to modulate refrigerant flow to each zone. They use a network of refrigerant piping to connect the outdoor systems to the indoor ones and then use

compressors to vary how much refrigerant each indoor unit gets so each zone can be heated or cooled independently. Examples include Daikin's air-cooled and water-cooled VRV systems,[3] Trane's air-source, water-source, and hybrid VRF systems, Carrier's air-source and heat recovery VRF systems, and Bosch's air-source and water-source VRF systems.

73.     A VRF has several groups of parts. The outdoor unit has the main compressor (the part that pumps the refrigerant) and a fan to expel heat to the outdoors. In many buildings, there are several connected outdoor units to get more capacity. The indoor unit has a fan coil to heat or cool the air, a fan to blow air into the ducts, and a filter to clean the air. Thin refrigerant pipes run from the outdoor unit to all the indoor units.

74.     For the largest commercial and institutional structures, Defendants sell chillers. These are for buildings like office towers, hospitals, and college campuses. Chillers make cold water for entire buildings. The VRF systems and chillers feed air-handling units inside the building, which do the work of moving, filtering, and heating or cooling the air.

75.     A typical commercial chiller contains all the main refrigeration

---

3 Daikin trademarked the variable refrigerant volume ("VRV") term, but VRF and VRV systems are technologically the same. See Daikin, VRV and VRF Systems (Variable Refrigerant Volume/Flow), available at https://www.daikin.co. uk/en_gb/about/daikin-innovations/variable-refrigerant-volume.html (last accessed Mar. 19, 2026).

components in one package: a compressor, evaporator, condenser, expansion device, and associated controls, valves, and power gear.

## B.  HVAC Equipment Market Structure

76.   An approximation of market size distribution for each HVAC Equipment application is shown below.

**Figure 1**



77.   The market for HVAC Equipment in the United States was approximately $31.26 billion in 2024

## C.  Pricing in the HVAC Equipment Industry

78.   Pricing of residential HVAC Equipment is generally consistent across the Defendants' brands, with ranges between $4,000–$13,000 depending on the

model customers select. Model prices vary based on efficiency ratings, speed varieties, size/capacity, noise-reduction, and other factors. Residential HVAC Equipment installation factors such as labor costs, home sizes and duct-work, and the complexity of the systems being installed lead to significant variabilities in overall consumer cost.

79.    Pricing of commercial HVAC Equipment is also generally consistent across the Defendants' brands, with ranges between $5,000 to over $100,000 depending on the commercial application. For instance, a small retail shop is going to require a much smaller system than a warehouse. Commercial HVAC Equipment prices also vary based on efficiency ratings, size/capacity, and type of system. Commercial HVAC Equipment installation factors such as labor and equipment costs, permit and inspection fees, and design and engineering costs, and duct-work also lead to variabilities in overall cost.

**D.    Overview of the HVAC Equipment Manufactured by Each Defendant**

80.    Bosch produces inverter ducted split ("IDS") heat pumps, geothermal water pumps, residential and commercial heat pump systems, commercial packaged rooftop and split units, air handling units, various furnaces, and air purifiers, among others. Bosch offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

81.    Trane produces residential products such as air conditioners, furnaces,

and heat pumps. Trane's line of commercial products includes airside equipment, chillers, commercial heat pumps, cooler distribution units, packaged units and split systems, VRF heating and cooling systems; and geothermal pumps. Trane offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

82. Daikin produces a range of residential and commercial products such as split/multi-split type air conditioners, unitary (ducted split) systems, air to water heat pump systems, air purifiers, heating systems, packaged air conditioners, medium/low temperature refrigeration, ventilation products, rooftop systems, air cooled chillers, water cooled chillers, airside equipment, and VRV systems. Daikin offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

83. Lennox produces a range of residential and commercial products such as air conditioners heat pumps, furnaces, air handlers, packaged units, indoor air quality units, water heaters, unit heaters, and duct furnaces. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

84. Rheem produces a range of residential products such as air conditioners, air handlers, furnaces, heat pumps, and water heaters. Rheem also produces a range of commercial products such as air handlers, packaged air

30

conditioners, packaged gas electric units, packaged heat pumps, split air conditioners, split heat pumps, electric water heaters, gas water heaters, heat pump water heaters, storage tanks, tankless electric water heaters, and tankless gas water heaters. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

85.     AAON manufactures a range of primarily commercial products such as packaged rooftop units, split systems, air handling units, and condensing units, among others. AAON offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

E.     **The Air-Conditioning, Heating, and Refrigeration Institute**

86.     Participants in a conspiracy often rely on a closely controlled industry trade association to facilitate information sharing, provide opportunities to meet in person, and otherwise monitor and enforce their conspiracy. In the HVAC Equipment conspiracy, AHRI played this role.

87.     AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. It is largely controlled by Defendants and their senior executives. The AHRI Board of Directors is comprised of multiple senior HVAC executives and board members. For example, the 2026 AHRI Board includes: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate Solutions

31

Americas, Gaurang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President Americas, David Budzinski.

88.    AHRI purports to "act[] as an impartial central agency for gathering individual company data and distributing it in summaries covering bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales."

89.    AHRI follows a give-to-get model for information sharing. In order for members to receive industry data, they must provide that same data for their own company. AHRI states that "AHRI statistical data is not for sale," and instead is only available to HVAC Equipment companies that also provide AHRI (and their competitors) their own confidential data.

90.    AHRI's HVAC Equipment information "is compiled in various reporting formulas and distributed in aggregate form to participants in monthly, quarterly, semi-annual, or annual reports." Indeed, AHRI boasts that they turn participants' data into "an industry report that they get so they can really get an idea of exactly where they stand in the market for [each] product" they manufacture for the AHRI "statistics program that consists of over 150 reports covering over 30 different product types." The reports are "based on what the members would like to buy in the reports, what data they'd like to provide."

32

91.     At the start of the conspiracy in 2020, AHRI launched a new "Analytics App and Executive Dashboard," which it describes as follows:

> In 2020 AHRI launched the Executive Dashboard to provide certification program participants with real-time program performance data, industry statistics, and the predictive analytics needed to drive results. As part of our commitment to further develop our suite of data analytics services, we are proud to introduce the AHRI Analytics App. This exciting new tool is designed to enhance the user's experience by providing access to data related to individual product performance, which can then be compared to the data of other AHRI certification program participants, along with predictive analysis.

92.     AHRI has a Standards Policy Committee (StdC) that "defines the policies and procedures related to development and approval of AHRI standards, guidelines, and stand-alone appendices." In 2024, for example, AHRI's StdC was Chaired by Darcy Lee of Trane. Voting members of the StdC in 2024 also included: Dominique Taudin of Carrier, Bruce Perkins of Lennox, Sachin Nehete of Rheem, and Patrick Marks of Johnson Controls (now Bosch).

93.     AHRI also has a chat platform called "AHRI Connect," a portal where "members and invited guests interact with other air conditioning, heating, and refrigeration industry leaders and technical experts" and which allows its users "to join communities where they can take part in vibrant discussions and work collaboratively with colleagues across the globe, access documentation instantaneously, and stay abreast of critical news updates."

94.     An example of the information available in just one of AHRI's reports, a monthly report called "Air Conditioning Today", includes the following information:

**Notes and FAQs**

*A shipment is defined as when a unit transfers ownership; a consignment is not a transfer of ownership. Industry data is aggregated from the information supplied by AHRI member companies that participate in the statistics program and can be subject to revision. Published year-to-date data is inclusive of all revisions. No other AHRI data (e.g., by state or region) is available to the public other than that published. AHRI does not conduct any market forecasting and is not qualified to discuss market trends. BTUHs of 64.9 and below are for residential units; 65.0 and above for commercial. For previous monthly shipment releases and historical data, please see http://www.ahrinet.org/statistics.*

**How do my colleagues subscribe to the report?**

*Go to http://www.ahrinet.org/statistics and click on Subscribe.*

**Does this data represent shipments to the United States only or are shipments outside of the United States included?**

*This data represents shipments to customers in the United States only.*

**Do you provide U.S. data by state?**

*That data is not available publicly.*

**Is historical data available in Excel?**

*It is available monthly reflecting exactly the data presented in the monthly public release.*

**Is data available in a different format?**

*The only format available is provided on the website.*

**Does the December YTD data equal full calendar year?**

*Yes, it does.*

**Can I purchase additional industry data from AHRI?**

*No, AHRI statistical data is not for sale.*

**Does AHRI provide information for academic research purposes?**

*AHRI is not authorized by our members to provide information other than what is listed on our website.*

**How much of the industry does the data represent?**

*Although we cannot get into specifics about how much of the industry the data represents, in general, AHRI is one of the largest trade associations in the nation, representing more than 300 heating, water heating, ventilation, air conditioning and commercial refrigeration manufacturers within the global HVACR industry. AHRI's 300+ member companies account for more than 90 percent of the residential and commercial air conditioning, space heating, water heating, and commercial refrigeration equipment manufactured and sold in North America.*

**Is it accurate to use the number for year-to-date U.S. shipments as a measure of sales?**

*AHRI reports track shipments, which are defined as when a unit transfers ownership. While some people use the terms shipments and sales interchangeably, they may not be the same.*

95.     AHRI has at least two in-person board meetings each year. In 2026, those meetings are scheduled for June in Arlington, Virginia (where AHRI is based) and for November in Puerto Rico.

**a. Pre-2020: Relatively Stable Pricing That Tracked the CPI and**

**Household Appliance PPI**

96.     Prior to the commencement of Defendants' conspiracy in or about January 2020, HVAC Equipment generally experienced stable and small price increases, consistent with both what one would expect in a normal market and with general consumer price trends.

97.     Through the end of 2019, the HVAC PPI consistently tracked the CPI and the Household Appliance PPI. That all began to change in January 2020, when Defendants launched their conspiracy. The fruit of their efforts became increasingly apparent as the spread between the HVAC PPI and the CPI grew exponentially.

98.     In early 2019, some HVAC companies sought to increase prices, but they were not successful or as large of increases in the margin between costs and price because not enough HVAC companies announced prices together. For instance, on February 13, 2019, Nortek Air (now part of Rheem) announced a 6% increase for the first quarter of 2019. But other companies did not make similar announcements, so following through on and making the price increase stick was more difficult. Defendants needed a better boogeyman to blame, and they found it in early 2020 with the onset of COVID-19, which end users accepted as a legitimate reason for price increases, even though it was not.

b.  **2020: The Onset of the COVID-19 Pandemic and the Phasedown of HFCs Under the AIM Act Provided the Perfect Opportunity and Pretext for the Conspiracy to Succeed**

36

99.     Defendants launched their conspiracy on or around January 1, 2020. They began relying on publicly announced price increases, most often made through ACHR News. ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," and its website appears to have centralized reporting on the specifics of each price increase announcement. Almost all of the price increases that follow in this section of the Complaint were announced through ACHR News.

100.    In the lead up to the start of the conspiracy on or around January 1, 2020—and before Defendants had the convenient excuse of widely spreading COVID-19 to blame for price increases—some companies announced prices increases. For instance, on November 15, 2019, Lennox announced a price increase of 3-6% effective January 1, 2020. On November 18, 2019, AAON announced a price increase of 5% effective December 5, 2019. On December 5, 2019, Amana (Daikin) and Goodman (Daikin) announced a price increase of 6% effective February 1, 2020. On December 13, 2019, Allied Air announced 4-6% increase effective February 1, 2020. The fact so many of these increases were publicly announced, primarily through ACHR News, was notable.

101.    In early February 2020, AHRI held its annual meetings in Orlando, Florida. At the time, AHRI's Vice Chairman was Mike Schartz, CEO of Daikin Applied. AHRI's Board of Directors then included Gary Bedard, EVP, President,

and COO Worldwide Refrigeration at Lennox, Mike Branson, President at Rheem, Elizabeth Haggerty, VP and GM Global Ducted Systems at Johnson Controls, Chris Nelson, President Residential and Commercial Systems at Carrier, and Donny Simmons, President Commercial HVACR at Ingersoll Rand (which at the time, wasTrane's parent). Upon information and belief, ACHR News staff were present at and attended the AHRI conference and provided coverage of all AHRI and other industry conferences.

102.   Then came the COVID-19 pandemic in early 2020, which presented a golden opportunity. No customer could question that the pandemic had the potential to disrupt supply chains, so coordinated price increases suddenly became a bonanza for Defendants, eventually driving the prices of some HVAC Equipment to record highs, at levels that vastly exceeded the Consumer Price Index, as alleged herein.

103.   Johnson Controls announced, through ACHR News, in August 2020 it was "implement[ing] a price increase of up to six percent on residential and commercial heating and cooling products," effective October 1, 2020. Johnson Controls attributed the increase to challenges related to the COVID-19 pandemic and the "escalating frontline manufacturing costs" that resulted.

104.   Trane was the next to announce a price increase of up to 6% on September 30, 2020 for select commercial "Trane unitary, applied, and controls equipment," effective November 7, 2020. Again, Trane made its price increase

38

announcements through ACHR News. On October 30, 2020, AAON announced a 4% price increase on select commercial HVAC Equipment, effective January 11, 2021. Like the others, AAON announced its price increase through ACHR News.

105.   Trane tested the waters again on November 2, 2020, announcing price increases of up to 8%. It was reported that "[t]he increase, effective January 1, 2021, applies to Trane, American Standard Heating & Air Conditioning, RunTru by Trane and Ameristar equipment, and all parts and supply brands."

106.   Lennox soon followed Trane's lead, announcing on November 9, 2020 that it would increase prices by 4–6% on all residential and commercial equipment, effective January 18, 2021.

107.   The next month, on December 9, 2020, Nortek Air Solutions, another HVAC manufacturer and now part of Rheem, announced a price increase ranging from 3–9% on all its products. The company blamed the increase on "recent rises in labor rates, third-party component vendor prices, and a cost escalation on steel, copper, aluminum, and other commodities."

108.   Later that month, Nortek separately announced a 6% price increase on residential and commercial products, effective March 1, 2021.

109.   Like its parent company, Lennox, did the month prior, Allied Air announced an identical price increase of 4–6% on December 21, 2020, effective February 1, 2021, "due to inflationary pressures to due to transportation and input

costs."

110. At the end of the year, on December 27, 2020, Congress enacted the AIM Act, which mandated the phasedown of HFCs. This prohibition covered R-410A, the primary refrigerant used in air conditioning condensers and heat pumps at the time. Beginning on January 1, 2025, the AIM Act prohibited Defendants from manufacturing or importing new R-410A systems. This provided further cover and pretext for Defendants' conspiratorial price increases.

### c. 2021: The Conspiracy Gathers Steam

111. On March 8, 2021, Trane announced a price increase of up to 7.5% on for its commercial HVAC Equipment, effective April 9, 2021.

112. AAON followed with a price increase on commercial HVAC Equipment the next day, raising prices by 4% on all HVAC Equipment, effective June 1, 2021. The company blamed the impact of rising raw material prices on component costs.

113. Later that month, on March 31, 2021, Trane announced an additional price increase specific to residential HVAC Equipment of up to 6%, effective April 1, 2021.

114. Less than two weeks later, on April 12, 2021, Lennox announced a similar price increase of 6–9% on all residential and commercial HVAC Equipment. Elliot Zimmer, President and CEO of Lennox Commercial, blamed "inflationary

pressures on raw material costs." Quan Nguyen, VP and General Manager of Lennox Residential, explained, "These increases on steel, copper, plastics, and integrated components require us to pass these costs through the value chain." However, as discussed in this Complaint, such pretextual excuses for price increases do not explain the magnitude and level of price increases seen during the Class Period.

115. Three days later, on April 15, 2021, Daikin announced a price increase of 6% on all commercial heating and cooling HVAC Equipment, effective April 26, 2021.

116. Four days after Daikin's announcement, on April 19, 2021, Lennox subsidiary Allied Air announced a price increase of between 5–7% beginning June 1, 2021 "[d]ue to inflationary commodity and operational costs."

117. Effective June 1, 2021, Carrier increased prices by up to 7% on North American residential, light commercial, and commercial HVAC Equipment.

118. On June 17, 2021, AAON announced it would be raising prices for the third time in under a year, this time by 5%. Effective September 1, 2021, AAON blamed the price increases on "inflationary pressures."

119. Johnson Controls (now part of Bosch) implemented a price increase of 3.5% on HVAC Equipment, effective July 1, 2021.

120. On July 2, 2021, Trane announced price increases of up to 7% on select commercial HVAC Equipment, effective August 7, 2021.

41

121. Then, on July 9, 2021, Trane announced a price increase of up to 7% on select residential HVAC Equipment that shipped on or after August 9, 2021.

122. Five days later, Carrier followed suit, announcing price increases of up to 8% on all "North America residential, light commercial, and commercial applied products effective September 1, 2021."

123. Less than two weeks later, on July 23, 2021, Lennox announced an identical 8% price increase on residential and commercial HVAC Equipment "due to further rise in inflationary costs," effective September 1, 2021.

124. Lennox subsidiary Allied Air also announced an 8% price increase that same day, effective October 1, 2021, "due to inflationary pressures from transportation and input costs."

125. Nortek Air Solutions (now part of Rheem) showed its support for its competitors' price increases when on August 10, 2021, it announced increases of its own from 8–12% on all HVAC Equipment, effective August 16, 2021. The company pretextually explained, "The increase is a result of surging commodity prices and continued availability shortages on materials such as steel, copper, aluminum, and resin, along with third-party component vendor price increases."

126. Daikin announced an identical 8% price increase on September 3, 2021, taking effect on select commercial HVAC Equipment that shipped after January 1, 2022.

127. On September 21, 2021, AAON announced its fourth price increase over the prior 12 months. The company implemented another 5% price increase, effective January 1, 2022, citing "inflationary pressures" once again.

128. Blaming "persistent cost inflation," Lennox announced an additional 13% price increase for commercial HVAC Equipment on October 18, 2021.

129. Carrier announced on October 26, 2021, a price increase effective January 10, 2022 of up to 12% on North American commercial HVAC Equipment and up to 10% on residential HVAC Equipment.

130. On November 3, 2021, Lennox announced a further price increase of up to 13% on residential HVAC Equipment, effective January 1, 2022.

131. On November 5, 2021, Rheem subsidiary HTPG announced a price increase of 11% on commercial HVAC Equipment orders received on or after December 6, 2021. The company blamed the price increase on the pandemic, claiming that it had impacted the supply chain and led to rising prices for freight, raw materials, and component costs.

132. On November 12, 2021, Allied Air (Lennox) announced a comparable price increase of up to 12% effective January 1, 2022, again pointing to "persistent inflationary costs."

133. Trane followed three days later, announcing an identical price increase of up to 12% on residential and commercial HVAC Equipment. Like Carrier,

Lennox, and Allied Air, Trane made its residential price increases effective January 1, 2022, and its commercial price increases effective January 15, 2022. Such a series of closely timed rounds of large price increases was unprecedented in the HVAC Equipment industry.

### d. 2022: The Conspiracy Takes Off

134. On March 2, 2022, AAON announced a further 7% price increase on all commercial HVAC Equipment as "a result of inflationary pressures," effective March 29, 2022.

135. One week later, on March 9, 2022, Carrier announced a price increase of up to 9% on North American residential, light commercial, and commercial HVAC Equipment, effective April 11, 2022.

136. Less than three weeks after Carrier's announcement, Lennox announced on March 28, 2022 a matching price increase of up to 9% on residential and commercial HVAC Equipment, effective May 2, 2022.

137. On April 4, 2022, Trane announced a price increase of up to 9%—identical to the price increases announced by Carrier and Trane less than one month prior—on residential and commercial HVAC Equipment, effective May 1, 2022.

138. On April 18, 2022, Lennox subsidiary Allied Air announced a price increase of up to 9%, effective June 1, 2022, again pointing to "persistent inflationary costs."

139. A slew of commercial-specific increases on HVAC Equipment occurred throughout the duration of 2022. Daikin was first with its May 10, 2022 announcement of price increases of up to 12% on commercial HVAC Equipment, effective May 25, 2022. One week later, on May 17, 2022, Trane announced a price increase of up to 18% on select commercial HVAC Equipment, effective one day prior. Hot on the heels of the announcements from Daikin and Trane, on May 26, 2022, Carrier announced a price increase of up to 12% on North American light commercial and commercial HVAC Equipment, effective July 11, 2022.

140. Beginning June 1, 2022, AAON "implemented a 1% per month price increase." This rolling price increase allowed AAON "to realize more pricing each month," with the company reporting on May 4, 2023 that "pricing compris[ed] 22.0% of growth."

141. The next month, on June 28, 2022, Lennox announced a price increase of up to 14% on commercial HVAC Equipment, effective August 1, 2022, due to "persistent cost inflation and regulatory transition."

142. Lennox's subsidiary, Allied Air, also announced a price increase of up to 14% on commercial HVAC Equipment on July 25, 2022 because of "inflationary pressures to due to transportation and input costs," effective August 1, 2022.

143. A mere four days later, on July 29, 2022, Daikin announced an increase of up to 5% on commercial HVAC Equipment for all orders beginning on August

45

31, 2022.

144. Trane very nearly matched Daikin's price increase, announcing on September 9, 2022 a further 3–6% increase of its own on commercial HVAC Equipment, effective September 10, 2022.

145. On November 14, 2022, Carrier announced a further price increase of up to 8% on North American commercial HVAC Equipment, effective December 5, 2022.

146. "Due to persistent cost increases," Lennox announced on December 5, 2022 that it would be increasing residential and commercial HVAC Equipment prices by as much as 8%, effective January 1, 2023.

147. Similarly, "due to inflationary pressures to due to transportation and input costs," Lennox subsidiary Allied Air announced a price increase on December 9, 2022 of up to 8% on residential and commercial HVAC Equipment, effective January 1, 2023.

148. The very same day, Trane announced a price increase of up to 10% on residential HVAC Equipment, effective January 9, 2023.

### e. 2023: The Conspiracy Hits Its Stride

149. Defendants' goal in 2023 was to maintain the supracompetitive price levels they had achieved from 2020 to 2022, often by announcing price increase that did not actually raise prices but rather stabilized them and avoided significant

decreases from the record price levels.

150. Trane announced its commercial HVAC Equipment price increases on January 9, 2023, about a month after its residential price increases, raising prices by 4–7.5%, effective January 14, 2023.

151. Not long after, on February 2, 2023, Trane publicly reported, "Strong volume growth, positive price realization and productivity more than offset material and other inflation related to supply chain challenges and higher costs to serve customers."

152. A mere five days later, Carrier issued a press release that almost mirrored Trane's announcement: "Strong price realization more than offset unprecedented inflation and productivity savings more than offset strategic incremental investments."

153. From April 2–5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem would all meet again in New Orleans for the Air Conditioning Contractors of America ("ACCA") 2023 Conference & Expo.

154. On May 1, 2023, Trane announced another increase of 4–6% on commercial HVAC Equipment, effective May 5, 2023.

155. In July 2023, Lennox's CEO, Alok Maskara, stated, "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful." He continued,

47

"Our outlook on both components and commodity cost inflation remains stable and unchanged, and we expect the second half of the year to deliver a positive price versus inflation spread."

156. On August 9, 2023, Bosch raised prices on heat pumps, citing "adjustments to market conditions and supply chain challenges."

157. On September 18, 2023, Trane announced price increases on commercial HVAC Equipment, ranging from 2% to 6%, effective October 7, 2023.

158. Lennox announced similar price increases on October 24, 2023, raising prices by up to 8% on commercial HVAC Equipment, effective January 1, 2024.

159. On November 14, 2023, Carrier announced a price increase of 8% on North American commercial HVAC Equipment, effective the following month.

160. Three days later, on November 17, 2023, Trane announced one final HVAC Equipment price increase for the year, raising prices by up to 5% on some residential products, effective January 1, 2024.

161. Lennox followed with price increases of its own less than two weeks later on November 30, 2023, increasing residential HVAC Equipment prices by up to 10% because of "expected increases in the cost of R-410A refrigerant as well as other inflationary pressures." The price increases were effective February 5, 2024.

162. On December 5, 2023, Lennox's Allied Air subsidiary announced price increases of up to 10% on residential and 12% on commercial HVAC Equipment.

The company claimed the increases, effective January 2, 2024, were a "response to inflationary cost pressures."

### f. 2024: Defendants Maintain Their Conspiracy

163. Carrier announced the first price increase of the year on January 5, 2024, raising prices by 6–10% on all products. Effective March 4, 2024, "The increase on residential products will be by a blended average of 6%, the increase on light commercial products will be by a blended average of 8%, and the increase on commercial applied products will be by a blended average of 10%."

164. Effective January 12, 2024, Bosch raised prices on heat pumps by 6%. The company attributed the higher prices to "increased costs in raw materials and logistics."

165. On January 18, 2024, Nortek Global HVAC (now part of Rheem) announced price increases of up to 8% on all residential HVAC Equipment, effective February 26, 2024.

166. Trane also announced price increases that month—six days after Nortek, on January 24, 2024. Trane raised prices on commercial HVAC Equipment by 2–6%, on average, effective February 10, 2024.

167. Effective February 1, 2024, Daikin increased prices of residential HVAC Equipment by up to 7%.

168. In September 2024 Lennox's CFO, Michael Quenzer spoke about the

remarkable shifts that had happened over the prior years in the HVAC Equipment industry, noting "Yeah, shares don't shift a lot in our industry." Market share stability is a sign of collusion because it suggests that competitors have ceased competing for business on price.

169. On December 10, 2024, Trane raised prices of select commercial HVAC Equipment, effective January 12, 2025, with most increases falling in the range of 2–5%.

170. Over the course of 2024, Rheem—a private company—increased its HVAC Equipment prices by 8–15% through public price announcements.

### g. 2025: Defendants Keep the Price Increases Coming and Publicly Embrace "Price Discipline"

171. Lennox subsidiary Allied Air kicked off the new year with a price increase announcement on January 2, 2025. The company raised residential parts and commercial HVAC Equipment prices by 5%, effective January 13, 2025.

172. Effective February 1, 2025, Trane announced a 10% price increase on residential HVAC Equipment.

173. On February 1, 2025, Daikin announced a price increase on all residential and commercial HVAC Equipment by 8–10%, effective April 1, 2025.

174. Also on February 1, 2025, Daikin subsidiary Goodman announced a price increase on residential HVAC Equipment by 8–10%, effective April 1, 2025.

175. Finally, on February 1, 2025, Daikin subsidiary Amana announced a

price increase of 8–10% on all residential HVAC Equipment, effective April 1, 2025.

176.  Effective March 1, 2025, Carrier increases prices on residential HVAC Equipment by 6%, light commercial HVAC Equipment by 8%, and commercial HVAC Equipment by 10%.

177.  In April 2025, Rheem announced price increases on HVAC Equipment of approximately 6%. Also in April 2025, Lennox increased HVAC Equipment prices by another 6%. Effective May 1, 2025, Bosch increased heat pump prices by 2%.

178.  On September 10, 2025, during the 13th Annual Morgan Stanley Laguna Conference, David Gitlin, Chairman and CEO of Carrier, and Patrick Goris, Senior Vice President and CFO of Carrier, delivered prepared remarks and responded to an analyst's questions. One question asked, in light of the challenging market conditions, whether "there's price risk or price competition that could come to the resi market?" Carrier's Senior Vice President and CFO, Patrick Goris, dismissed the idea of price competition by refusing to directly address it, remarking instead, "What we've seen so far this quarter is that the combination of the price and the mix up is still double-digit positive. And so that is -- obviously, that's really good."

179.  Speaking at the same conference the next day, Michael Quenzer, CFO

of Lennox, detailed Defendants' collective discipline and signaled Lennox's forthcoming price increases:

> Yeah, I think so far we've seen very rational pricing from all the OEMs. A lot of these OEMs have the same input costs as we do. They're seeing the same tariff pressures. They're seeing the same investments they had to make to switch to the new refrigerant products. **Very disciplined on the industry right now pushing price**. I expect price and cost to continue to go up. I don't think inflation is going to stop here. **I think the next level will be early next year when we all come out and announce our next full round of price increases.** For the balance of the year, I think we're pretty well set from a price perspective. **Next year, we'll do our annual price increase, and just like we always do, we expect similar results by others.**

180. Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke that day, with Regnery revealing in a prepared remark that—in keeping with Lennox's call for discipline—Trane had reduced production to manage supply: "We have taken some time out of our factory so that we can balance the inventory load within the channel."

181. On September 27, 2025, Trane increased commercial HVAC Equipment prices, with most increases ranging from 1–4%.

182. In November 2025, Patrick Goris, Carrier's Chief Financial Officer and Senior Vice President, was asked by an analyst to discuss "this type of kind of industry-wide volume correction" and how "people start to ask about price and mix and those types of things. It doesn't sound like you see any sort of pressure from the

OE, kind of the other OEs in terms of taking price down. I mean, if anything, it can still go up. Just kind of talk about the pricing environment in [the] industry right now where volumes are so pressured." Goris responded:

> It certainly is a watch item. Because as you say, when volumes are down so much, it's the natural question that comes up. In Q3, our overall pricing was up double digits year over year. Now that's a combination of the mix-up with the new units with the new refrigerant, which are more costly than the prior units, and some price increase. Some of that, of course, relates to some of the input cost increases that we've seen. This quarter, the increase will probably be a little bit less year over year, but only because we're starting to lap quarters last year where we started selling the new refrigerant units. Our intention is still that we would announce a price increase in residential in the Americas for next year, likely in the mid-single-digit range. One of the reasons is we see continued increase in some of the input costs. If you look at what copper has done, what aluminum is doing, we see some increases there. We would expect to realize, call it low single-digit price increases in the Americas resi for that reason.

183. During Carrier's earnings call on December 4, 2025, David Gitlin, Chairman and CEO, made it clear that it viewed its prioritization of margin over market share as an example for the company's competitors to follow: "And we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year."

184. December 2025 saw a number of additional parallel price increase announcements. Effective December 31, 2025, Bosch increased the prices of its heat pumps. Also, effective December 31, 2025, Bosch's Coleman brand increased

HVAC Equipment prices by 6–8%. Bosch's Evcon brand also implemented a 3% price increase, effective December 31, 2025.

### h. 2026: Lennox's CFO: "The industry's generally been disciplined for the past several years … we're gonna continue to increase our pricing"

185. Effective on the first day of the new year, Lennox increased prices of commercial HVAC Equipment by up to 5%.

186. During Trane's January 29, 2026 earnings call, Chris Kuhn, the company's Executive Vice President and CFO, revealed that Trane "reduced factory production days by one-third" in order "to normalize residential inventory." He later explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. If I think about the fourth quarter, and pricing, it really is more due to volume being lower than anything else." Kuhn also assured Trane's competitors that it would not decrease prices, explaining, "I don't want anyone to think that pricing is coming down in that market." In a competitive environment, the decision to reduce production by 1/3 would simply give away market share to one's competitors. However, due to the conspiracy, Trane could be sure that competitors would not compete for its market share but would instead also restrict its supply and maintain high pricing.

187. ACHR News reported on January 30, 2026 that Lennox CEO "[Alok]

54

Maskara reinforced that pricing discipline remains consistent across the industry."

In the article, Maskara affirmed Lennox's commitment to price increases that his company observed from its competitors, saying, "Based on everything we have seen so far, we see our competitors aiming at similar price increases."

188. Effective February 16, 2026, Lennox increased prices of residential HVAC Equipment by up to 10%.

189. Defendants' executives publicly discussed their very recent price increases while attending Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026 in Miami, Florida. During a presentation on February 17, in response to a question about price competition in the residential business segment, Lennox CFO Michael Quenzer once again commended the industry for its pricing discipline—increasing margins by raising prices and not competing for market share— and explained that the industry learned its lesson when it comes to competing on price:

> But if you look at the replacement side, overall, the industry's generally been disciplined for the past several years. We've had cost inputs coming into our business. Others have as well, and we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share.

190. By complementing the industry for its discipline and saying that "pricing, you know, taking it away, does not win market share," Quenzer was

acknowledging that Lennox and its competitors would no longer compete for market share by, for example, lowering prices to win customers from competitors, which is inconsistent with the behavior of competitors in a market free from an anticompetitive agreement.

191.  Quenzer also announced that Lennox would follow Trane's lead in reducing production to manage supply, stating, "So what we've been trying to do is very disciplined, kind of reduce our inventory levels … . So what we're gonna do is reduce some production in the first quarter, keep our inventories flat."

192.  Trane's executive presented at the conference that same day. Chris Kuehn, Trane's CFO, echoed the sentiment of Lennox's CFO, Michael Quenzer, announcing, "On price, the team announced a price increase just in the last 10 days. It's up to 5%, effective April 1, and so our plans are to make sure we continue to capture price to offset inflation and still get a spread on that." And he explained that the company's price increase was possible because "the industry has been very disciplined in that regard over many years."

193.  Two days later, Carrier's Chairman and CEO, David Gitlin, followed the lead of his company's competitors and announced an identical 5% increase at the conference: "If you look at our residential businesses in terms of realization rates, it's probably best as you go from west to east. In the Americas, we have 5% price that we've announced comes into place next month."

56

194.  On March 2, 2026, Daikin raised light commercial and commercial HVAC Equipment prices by up to 7% and increased other HVAC Equipment prices by 3.5–5%. That same day, Daikin's Amana and Goodman brands both also separately announced price increases of up to 7%. Effective March 16, 2026, Allied Air (Lennox) matched Daikin's 7% increase. And finally, that same month, Carrier announced its intention to increase its HVAC Equipment prices in the Americas by the "mid-single digit[s]" in 2026.

## VI. OTHER ASPECTS OF THE CONSPIRACY SUPPORT ITS PLAUSIBILITY

**A.    Defendants' Record Profits Demonstrate the Conspiracy's Success**

195.  Throughout the conspiracy, Defendants boasted about rising and record profit margins. For instance, in mid-2024, Morningstar resumed its coverage of Lennox and observed that the company's margins rose from "from about 8% during the last sales peak in 2007 to nearly 18% in 2023." Similarly, Carrier experienced significant profit increases of around 20% from 2020 to 2021 and 2023 to 2024, which correspond closely to their price increase announcements.

196.  In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

197.  During Trane's January 29, 2026 earnings call, EVP and CFO, Kuehn, revealed that Trane "reduced factory production days by one-third" to "normalize

57

residential inventory." He explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. I think about the fourth quarter and pricing, it really is more due to volume being lower than anything else." Then Kuehn reassured Trane's competitors that Trane would not cut prices: "I don't want anyone to think that pricing is coming down in that market.[4]

198.    AAON similarly experienced substantial profit growth in the wake of multiple price increases and a monthly 1% price increase beginning in June 2022, with the company reporting in a May 4, 2023 press release: "Gross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022. Price increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion."

## B.    A Preliminary Regression Analysis Supports Anticompetitive Harm to the Price of HVAC Equipment Caused by the Conspiracy

199.    To analyze the overcharge of Defendants' price-fixing conspiracy, Plaintiff's experts have conducted a regression model based on the relationship between the price of HVAC Equipment and the various input costs and other factors affecting prices but that are unrelated to collusion (e.g., cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy. This preliminary regression

---

4 Motley Fool, Trane (TT) Q4 2025 Earnings Call Transcript (Jan. 29, 2026), https://www.fool.com/earnings/call-transcripts/2026/01/29/trane-tt-q4-2025-earnings-call-transcript/.

analysis demonstrates that Defendants' price-fixing during the Class Period created higher prices than Plaintiff and the Class would have paid absent the conspiracy.

200. The determination of a price effect, if any, and the estimation of damages attributable to collusive behavior, if any, typically involves the comparison of prices during the period affected by the alleged unlawful conduct (referred to as the "damages" or "Class" period) to competitive prices during a "benchmark" period, i.e., prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can be used to estimate counterfactual, "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct.

201. As part of Plaintiff's experts analysis, it is common and proper to employ econometric methods to account for factors that affect prices but that are unrelated to collusion (e.g., supply and demand factors) to isolate the price effects, if any, of the alleged conspiracy. Plaintiff's expert applied the well-known and widely accepted dummy variable multiple regression methodology to estimate the price effects of the alleged conspiracy.[2] The dummy variable multiple regression methodology implements the comparison described above, in that it relies on comparing "prices in the impact period to available prices before and/or after the alleged period of impact,"[3] while controlling for other factors that affect prices.

202. Specifically, the multiple regression analysis illustrated in Figure 6

controls for all major non-conspiratorial factors by including variables for (1) compressor price index, (2) copper tubing price index, (3) aluminum price index,(4) steel price index, (5) plastic and resin price index, (6) production and nonsupervisory employees labor cost index in manufacturing, (7) utility price index for producers, (8) disposable income, (9) total units of new privately-owned housing, (10) climate, (11) average electricity price, (12) natural gas price for consumers, (13) average importing prices of HVAC Equipment, (14) average exporting prices of HVAC Equipment, (15) penetration rate of A2L (R-32 and R-454B), (16) inflation, (17) an indicator for the COVID affected period, (18) an indicator for the Great Recession affected period, and (19) calendar month fixed effects, which accounts for seasonality in prices. Thus, the estimated but-for prices account for inflation, changes in major cost and demand factors, changes in U.S. tariff, the COVID-19 pandemic, and the effects of refrigerant change precipitated by the AIM Act, among other factors. As shown Figure 6, all these factors together  predict price increases in 2020 and later (see predicted but-for prices in the figure), but they would not explain all of the substantial price increases. Actual prices are significantly higher than but-for prices in the period from January 2020 to the present even after accounting for all major non-conspiratorial factors. Specifically, the estimated overcharge is 8% and highly statistically significant. The overcharge regression results demonstrate that prices of HVAC systems were inflated above competitive

60

levels during the Class Period, accounting for all major non-conspiratorial factors that affect HVAC Equipment prices.

203.   The overcharge regression results demonstrate that prices of HVAC Equipment were maintained at an inflated level above competitive levels during the damages period, accounting for major non-conspiracy factors that affect HVAC Equipment product prices.

### C.     Plus Factors Support the Plausibility of Defendants' Conspiracy

204.   "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, Plus Factors and Agreement in Antitrust Law, 110 MICH. L. REV. 393, 393 (2011), available at https://repository.law.umich.edu/mlr/vol110/iss3/1. Plus factors support the plausibility of Defendants' conspiracy and include:

### 1.     There are no close substitutes for HVAC Equipment.

205.   The U.S. Census Bureau's Survey of Construction indicates that 95.4% of new single-family homes started in 2020 in the U.S. had central air conditioning, while the U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all U.S. homes have central air conditioning. Based on data collected by the U.S. Energy Information

Administration for its 2020 Residential Energy Consumption Survey, over 73% of homes have central heating.

206. HVAC Equipment is used to an equal extent in commercial buildings. A 2023 article by the U.S. Energy Information Administration states that 83% of commercial buildings had space heating in 2018, while 78% of commercial buildings had space cooling.

207. HVAC Equipment is vitally important to comfort and maintaining indoor air quality, and in many parts of the country it is crucial to remaining safe during periods of extreme winter cold and sweltering summer heat.

208. There are no significant substitutes for HVAC Equipment. Michael Quenzer, Lennox's CFO, stated, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

**2.      The demand for HVAC Equipment is inelastic.**

209. Price elasticity refers to the sensitivity of the quantity of a good demanded by a purchaser to changes in its price. If demand is elastic, a price increase causes demand for the good to decrease significantly. Conversely, if demand is inelastic, a price increase will have little or no effect on demand. Goods with reasonable substitutes have demand that is elastic. Goods that do not have demand that is inelastic. An example of a good with inelastic demand is gas; commuters, and the trucking and airline industries, will continue to purchase the gasoline they need

regardless of price. Demand for electricity is also inelastic since it is necessary for lighting, heating, cooling, and refrigeration.

210.   Inelastic demand allows a cartel to form and find success. If demand is inelastic, then cartel members can increase prices above competitive levels without the fear of consumers switching to a reasonable substitute, if there even is one. This is because the percentage decrease in the quantity demanded is smaller than the percentage increase in price.

211.   Demand for HVAC Equipment is inelastic. When HVAC Equipment fails, owners rarely delay purchasing replacement equipment, even if prices are high, because of the importance of HVAC Equipment to temperature regulation, comfort, indoor air quality, and safety, especially during the winter and summer seasons.

### 3.   The HVAC Equipment industry is highly concentrated and consolidated.

212.   A concentrated market is more susceptible to collusion. It is easier for competitors to enter into an anticompetitive agreement and sustain it when a small number of firms control a sizable portion of the market. At the same time, this makes it difficult for smaller firms outside a conspiracy to undermine its potency. The U.S. DOJ recognizes, "Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe'

sellers who control only a small fraction of the market." A high degree of concentration and a small number of conspirators also reduces concerns over cartel instability or cheating. For these reasons, market concentration is a plus factor in evaluating the plausibility of an antitrust conspiracy.

213. Here, the HVAC Equipment industry is highly concentrated, which benefits the formation and maintenance of a conspiracy. Seven companies dominate the market, owning dozens of brands of HVAC Equipment—giving purchasers the illusion of choice—and accounting for a collective market share of over 90% during the Class Period.

214. Another measure of market concentration is the Herfindahl-Hirschman Index ("HHI").[5] The U.S. Department of Justice and Federal Trade Commission use the HHI when evaluating whether a merger substantially lessens competition. In a perfectly competitive market, the HHI approaches zero, and it reaches its maximum of 10,000 points in a market controlled by a single firm. The U.S. Department of Justice and Federal Trade Commission consider a market with a score between 1,000 and 1,800 points to be moderately concentrated, while the agencies consider a market where the HHI exceeds 1,800 points to be highly concentrated. Using data from 2020, the HHI score for HVAC Equipment was over 1,588.

215. The HVAC Equipment market has also experienced consolidation,

---

5 https://www.justice.gov/atr/herfindahl-hirschman-index.

further increasing concentration and reducing competition. For example, in April 2023, Carrier announced the acquisition of heat pump manufacturer Viessmann Climate Solutions, which it completed in January 2024. In October 2024, Rheem Manufacturing completed its acquisition of Nortek Global HVAC, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under the Rheem umbrella. In August 2025, Bosch acquired Johnson Controls' residential and light commercial HVAC business for $8.1 billion, the largest acquisition in Bosch's history.

### 4.  The HVAC Equipment industry has high barriers to entry.

216.  Barriers to entry are obstacles that prevent new competitors from entering a market easily. They include steep startup costs, often in the form of capital expenditures to build manufacturing facilities and high research and development costs, patents, government regulations, acquiring and training a workforce, and brand loyalty or established brand names.

217.  An anticompetitive agreement that raises or sustains prices above competitive levels would ordinarily attract new entrants interested in competing for those increased profits. High barriers to entry, however, deter new competitors from entering the market, meaning they benefit entrenched participants. They also make it easier for existing market participants to collude since there is no concern about competition from new entrants who are not a party to the conspiratorial agreement.

218. The HVAC Equipment industry has significant barriers to entry. It costs hundreds of millions of dollars and takes multiple years to construct a new manufacturing facility and bring it online. A new plant also means hiring and training thousands of workers to operate, maintain, and oversee the facility. For example, Daikin broke ground on the Daikin Texas Technology Park in 2015, which cost $417 million to build, took more than two years to complete, and employs approximately 5,000 people.

219. In addition to the capital expenditure necessary to open a new plant, new entrants also have to overcome brand loyalty and strong name recognition of established brands, several of which like Lennox, Carrier, Trane, Rheem, and York and have histories of over 100 years.

### 5. HVAC Equipment is largely commoditized.

220. Economics defines a commodity as a basic good used in commerce that is interchangeable with other goods of the same type. When a product is characterized as a commodity, market participants primarily compete based on price. It is easier to implement and monitor an anticompetitive agreement when competition occurs primarily on price since price is more objectively measurable than non-price factors.

221. In the United States, the technology and processes for manufacturing HVAC Equipment are well established, as is the technology for the equipment itself.

66

As a result, there is limited HVAC Equipment product differentiation. In fact, a residential furnace manufactured by one Defendant is designed to replace another manufactured by a different Defendant. The same is true for heat pumps and air conditioning condensers.

222. Furnaces come in standard cabinet widths, have ratings measured in British Thermal Units per hour ("BTUh") to quantify the heating capacity (e.g., 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), and have standardized Annual Fuel Utilization Efficiency ("AFUE") ratings expressed as a percentage (e.g., 80%, 90%, and 95%). Heat pumps have ratings measured in British Thermal Units per hour ("BTUh") to quantify the heating capacity (e.g., 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), have Heating Seasonal Performance Factor 2 ("HSPF2"), have ratings to indicate energy efficiency for heating (e.g., 7.5 HSPF2, 9.5 HSPF2, and 10.5 HSPF2), have ratings measured in BTUh to quantify the cooling capacity (e.g., 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have Seasonal Energy Efficiency Ratio 2 ("SEER2") ratings to indicate energy efficiency for cooling (e.g., 13 SEER2, 16 SEER2, and 19 SEER2). A heat pump with a given heating and cooling capacity will have a similar footprint to a heat pump with the same heating and cooling capacity produced by a different manufacturer.

223. Air conditioning condensers likewise have similar footprints based on cooling capacity, have ratings measured in BTUh to quantify the cooling capacity

67

(e.g., 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have Seasonal Energy Efficiency Ratio 2 ("SEER2") ratings to indicate energy efficiency (e.g., 13 SEER2, 16 SEER2, and 19 SEER2). An air conditioning condenser with a given cooling capacity will have a similar footprint to an air conditioning condenser with the same cooling capacity produced by a different manufacturer.

**6.    Defendants had numerous opportunities to collude.**

224.  Defendants' high-ranking executives had frequent and regular opportunities to meet and collude, including through their membership in trade organizations.

**a.    The Air-Conditioning, Heating, and Refrigeration Institute.**

225.  The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the primary U.S. trade association for HVAC Equipment manufacturers. Trane, Lennox, Carrier, Rheem, Daikin, AAON, and Bosch are members of AHRI. AHRI hosts several events each year, including what it refers to as four premiere events.

226.  Defendants' senior executives currently hold and have held leadership roles on the AHRI Board of Directors during the Class Period.

227.  In 2026, Mike Branson (President of Global Air Division, Rheem) serves as Chairman and Holly Paeper (President of Commercial HVAC, Trane) serves as Vice Chairman, while David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Gaurang Pandya (President of

68

Climate Solutions Americas, Carrier), and Yogi Uemura (President, Daikin) serve on the Board.

228. In 2025, Mike Branson (President of Global Air Division, Rheem) served as Vice Chairman, while David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Gaurang Pandya (President of Climate Solutions Americas, Carrier), Holly Paeper (President of Commercial HVAC, Trane), and Yogi Uemura (President, Daikin) served on the Board.

229. In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman, while Mike Branson (President of Global Air Division, Rheem), David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), and Yogi Uemura (President, Daikin) served on the Board.

230. In 2023, Chris Nelson (President of HVAC, Carrier) served as Vice Chairman, while Gary Bedard (Executive Vice President and President of Residential, Lennox), Mike Branson (President of Global Air Division, Rheem), Doug Schuster (President of Global Air Distribution, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), Yogi Uemura (President, Daikin), and Philip Windham (President and CEO, Nortek Global HVAC, now part of Rheem) served on the Board.

231. From January 31 through February 2, 2022, executives from Carrier,

69

Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHR Expo in Las Vegas. Later, from March 28–30, 2022, executives from Carrier, Goodman Manufacturing (Daikin), Johnson Controls, and Rheem would all meet at the ACCA Annual Conference and Expo in St. Louis. At the ACCA conference, Casey Yates (Johnson Controls), Mike Branson (Rheem) and Justin Keppy (Carrier) participated in a HVAC manufacturers' panel discussion.

232.   The AHRI Expo was held on February 2–6, 2023 in Atlanta, at which in attendance were executives from Daikin, Johnson Controls, and Rheem. On April 2-5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana. At this conference, Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion about the state of the HVAC industry.

233.   The AHRI Expo for 2024 was held in Chicago, Illinois on January 22–24 and attended by executives from Carrier, LG, Mitsubishi, and Rheem. The ACCA Annual Conference and Expo followed on March 11–14 in Orlando, Florida attended by Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem. During this conference Chris Forth (JCI), Braden Cook (Carrier), John Schneider (Copeland), Doug Widenmann (Daikin), Randy Roberts (Rheem/Ruud), and Heather Buchicchio (Mitsubishi) all participated in a panel discussion about the current state of the

70

HVAC industry.

234. The AHRI Expo was held on February 10-12, 2025 in Orlando, attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem.

235. On March 23–27, 2025 in Austin, Texas, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo.

### b. Other industry conferences.

236. Other opportunities to collude existed outside of trade organizations. One such example was the 13th Annual Morgan Stanley Laguna Conference, which took place from September 10–12, 2025, and was attended by senior executives from Carrier, Trane, and Lennox. At this conference, Carrier's Senior Vice President and CFO brushed aside the concept of price competition, Lennox's CFO commended the industry's price discipline and discussed his company's forthcoming price increases, and Trane's CEO talked about the company's efforts to reduce supply, consistent with Lennox's call for discipline.

237. Defendants' executives were also present and spoke at the Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026 in Miami, Florida. It was there that Lennox's CFO spoke of the industry's discipline and mentioned price increases, while Trane's CFO announced a 5% price increase, while Carrier's CEO publicly matched two days later.

71

c.     **ACHR News.**

238.   As noted above, ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting." Defendants used ACHR News to signal to one another to perpetuate the conspiracy and communicate their adherence to it. Defendants extensively and nearly exclusively relied on ACHR News to immediate publish and disseminate their price increase announcements throughout the Class Period.

d.     **HARDI.**

239.   Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to collude. HARDI bills itself as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives that "serves its members through government affairs and advocacy efforts, **market intelligence and benchmarking**, training programs, and world class events." (Emphasis added).

240.   While ostensibly setup to support HVAC distributors, it is clear that HARDI provided the Defendant-manufacturers with further opportunities to collude. For example, at the 2025 HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to Supplier Manufacturers!" At that same Annual Conference, a roundtable discussion was held for "Manufacturer Reps Only," and was detailed as

being "[e]xclusively for manufacturer representative members, these roundtable sessions offer an engaging space to exchange ideas, share experiences, and refine your professional skills. Guided by the Manufacturer Rep Council, each table-led discussion is designed to provide practical insights, foster collaboration, and help you strengthen your expertise."

241. During the Class Period, the HARDI annual conference, which takes place early each December featured speakers from Defendants (such as from Trane and Bosch at the 2025 HARDI conference) and was also sponsored by at least certain Defendants (such as Bosch, Daikin, and Rheem).

## VI. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY, DIVERTING ATTENTION FROM AND PREVENTING DISCOVERY OF THE CONSPIRACY

242. Plaintiff and members of the Class did not have actual or constructive knowledge of their claims because of Defendants' affirmative acts to fraudulently conceal their conspiracy. Defendants' means of effectuating the conspiracy— including, but not limited to, price signaling, information sharing, production signaling, and in-person meetings—show that Defendants actively sought to prevent Plaintiff and members of the Class from discovering the conspiracy. It also means that Plaintiff and members of the Class lacked information that would have placed them on inquiry notice of the existence of an agreement to raise HVAC Equipment prices above competitive levels. Thus, Plaintiff and members of the Class did not

discover and, through the exercise of reasonable diligence, could not have discovered, the alleged conspiracy until shortly before this filing.

243. Defendants used terms like "discipline" and "price realization," and spoke of maintaining margins as a priority over competing for market share, to hide the conspiracy's existence and accomplish the conspiracy's goals, while also providing reassurance to co-conspirators of their continued commitment to the anticompetitive agreement. Examples of Defendants' use of coded language to conceal the conspiracy and maintain the information flow among co-conspirators include Lennox's CEO, Alok Maskara, stating that "industry pricing remains disciplined," Lennox's CFO, Michael Quenzer, stating that "the industry's generally been disciplined for the past several years [and] we're gonna continue to increase our pricing to maintain our margins" because lowering prices and sacrificing margins "does not win market share," Carrier's Chairman and CEO, David Gitlin, stating that "we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year," Johnson Controls' Chairman and CEO, George Oliver, crediting the "further expanding [of] our margin profile," in part, on the company's "disciplined pricing approach," and Daikin's talk of avoiding "falling into price wars with our competitors."

244. Not only did Defendants take affirmative steps to keep their agreement

74

secret and conduct the activities of the conspiracy in private, but they also gave alternative, non-conspiratorial explanations for HVAC Equipment price increases. These pretextual explanations were always public and intended to mislead Plaintiff and members of the Class—to divert attention away from the conspiracy.

245. Like in most industries, Defendants initially said supply chain disruptions following the onset of the COVID-19 pandemic in March 2020 were responsible for price increases on HVAC Equipment during the Class Period. For example, Rheem subsidiary HTPG sent a price increase letter that read, "The pandemic continues to impact our supply chain, our industry and the overall economy. Freight, raw materials (steel, aluminum, copper, wood and plastics) and critical component costs (compressors, valves and motors) have continued to rise significantly. As a result, HTPG will be implementing a general list price adjustment of 11% on equipment, parts, options and warranties." Defendants' price increases due to COVID-19 pandemic were often couched as price adjustments due to rises in "inflationary costs" and "cost inflation." Beginning in 2025, Defendants shifted the blame to tariffs. For example, Rheem's Senior VP and General Manager was reported as saying that "tariffs and overall economic conditions have increased the cost of raw materials."

246. Defendants also blamed two federal initiatives for price increases on HVAC Equipment during the Class Period: the updated SEER2 energy efficiency

75

standards and the phasedown of HFCs under the AIM Act.

247.    On January 6, 2017, the U.S. Department of Energy published the direct final rule establishing the new SEER2 energy conservation standards in the Federal Register, which set minimum efficiency requirements for new HVAC Equipment sold beginning on January 1, 2023.[6] Defendants therefore had at least six years to develop HVAC Equipment that complied with the SEER2 standards. Defendants still blamed the new SEER2 standards for equipment price increases. For example, on its website for HVAC professionals, Lennox claimed, "The new air conditioners will be approximately 10–15% more than [outgoing models]. The new heat pumps will be approximately 20–25% more than [outgoing models]. This price increase is due to a more efficient compressor, a more efficient fan motor, a larger coil and cabinet size, and a higher refrigerant charge to achieve the higher efficiency."

248.    Under the AIM Act, which was enacted on December 27, 2020, the U.S. Environmental Protection Agency required a phase-out of the R-410A refrigerant, prohibiting the manufacture and import of new air conditioning condensers and heat pumps that use R-410A beginning on January 1, 2025.[7] On its website that catered toward residential customers, Lennox pinned HVAC Equipment

---

6       https://www.federalregister.gov/documents/2017/01/06/2016-29992/energy-conservation-program-energy-conservation-standards-for-residential-central-air-conditioners.

7                        https://www.epa.gov/climate-hfcs-reduction/frequent-questions-phasedown-hydrofluorocarbons.

price increases on the refrigerant transition.

249.   With any regulatory change, new technology and components are needed to meet the updated standards and requirements. The transition to more environmentally friendly refrigerants is no different. Refrigerants will remain market priced based on supply and demand while the updated line of 2025 complaint [sic] systems will see a rise in price due to the new technology incorporated to maintain efficiency, reliability and overall system performance.

250.   Yet, it was the HVAC Equipment industry that spearheaded efforts to transition away from HFC refrigerants like R-410A by investing billions of dollars and more than a decade advocating for a transition away from HFCs. In fact, they claimed they had "invested the most and [were] the best prepared" for the transition, as shown by the 2019 congressional testimony of Stephen Yurek, President and CEO of AHRI:

> More than 15 years ago, the U.S. HVACR industry began investing billions of dollars in R&D to be the first to bring to market next generation refrigerant technologies. More than a decade ago, the U.S. HVACR industry began working with the George W. Bush Administration to initiate discussions under the Montreal Protocol for a global phase down of HFCs. After nearly a decade of advocacy by the U.S. HVACR industry, these discussions culminated in the Kigali Amendment to the Montreal Protocol in 2016. The Kigali Amendment intensified the global competition over next generation refrigerant technologies in the fast-growing international HVACR market. American-based companies have invested the most and are the best prepared to benefit from a global

transition out of HFCs and into American-made next generation refrigerant technologies.

251. Plaintiffs and members of the Class had no ability to determine the accuracy of these pretextual explanations for price increases that Defendants communicated to the public.

252. Defendants' fraudulent concealment tolls the applicable statutes of limitations on the claims of Plaintiff and the Class. It also acts to equitably estops Defendants from asserting any statute of limitations defense.

## VII.  CLASS ACTION ALLEGATIONS

253. Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a direct purchasers class (the "Class") defined as follows:

> All entities and persons who directly purchased HVAC Equipment in the United States from at least as early as January 1, 2020 through the present (the "Class Period") from one or more of Defendants and their co-conspirators.

254. The Class does not include: (a) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant; (b) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any business majority

78

owned by any such person; (c) any co-conspirator identified in this action; and (d) any federal governmental entities.

255.  Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

256.  **Numerosity**: Plaintiff does not know the exact number of Class Members[8] because such information presently is under exclusive control of Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable.

257.  **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased HVAC Equipment directly from one or more of the Defendants, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

258.  **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

    A.    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or

---

[8] Class Members refers to the members of the Class as defined in this Complaint.

stabilize prices of HVAC Equipment sold in interstate commerce in the United States;

B.     The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C.     Whether the alleged conspiracy violated the antitrust laws;

D.     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and Class Members;

E.     The effect of Defendants' alleged conspiracy on the prices of HVAC Equipment sold in the United States and applicable states listed in the State Law Class during the Class Period;

F.     Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G.     The appropriate class-wide measure of damages.

259.   These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

260.   **Adequacy**: Plaintiff will fairly and adequately protect the interests of

80

the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased HVAC Equipment and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

261.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class Members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class Members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

262.   The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

263.   Defendants have acted on grounds generally applicable to the Class,

81

thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.  DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST VIOLATION

264. During the Class Period, Defendants continued to sell HVAC Equipment to Plaintiff and other putative Class Members at prices artificially inflated by Defendants' price-fixing conspiracy.

265.  Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple coordinated price increases throughout the Class Period, as described above. Moreover, each of these activities resulted in new, overt acts that injured Plaintiff and the putative Class, thus creating a new cause of action for purposes of the statute of limitations.

266.  In addition, each sale of HVAC Equipment made to Plaintiff or the putative Class that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

267.  These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiff and the other members of the proposed Class.

268.   As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- and estoppel-related arguments, Plaintiff's claims and those of the putative Class are not time barred.

## IX.  PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE THE CLAIMS IN THIS LAWSUIT EARLIER

269.   Plaintiff's antitrust claims are governed by the discovery rule—*i.e.*, the statute of limitations does not begin to run until discovery of the injury from the alleged violation. Prior to the investigation and analysis performed by and for Plaintiff's counsel, Plaintiff and putative Class Members did not know—nor could they have known through the exercise of reasonable diligence—that the prices they were paying for HVAC Equipment were artificially inflated and causing them injury.

270.   Furthermore, even assuming that Plaintiff could have somehow discovered its injury sooner (which it could not), it could not have determined that such injury was the result of Defendants' price-fixing conspiracy. As discussed below, not only did Defendants never reveal the existence of their price-fixing conspiracy, they actively concealed its existence by, among other things, blaming price increases on rising raw material, packaging, labor, and energy costs, as well as environmental conditions such as heatwaves and droughts. Plaintiff did not know and had no reasonable way of knowing that these statements were false and, in fact, Plaintiff was being injured by Defendants' price-fixing conspiracy.

271. For these reasons, both the discovery rule and the doctrine of equitable tolling dictate that all of Plaintiff's claims and those of the putative Class, going back to the beginning of the Class Period, are timely.

## X. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

272. Throughout the Class Period, each of the Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiff and putative Class Members.

273. In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including publicly attributing the price increases to external market forces beyond their control. As set forth herein, and based on Plaintiff's analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

274. Throughout the Class Period, Defendants reinforced the appearance of a competitive market through statements in their public filings with the Securities and Exchange Commission. For example, these representations communicated to investors that HVAC Equipment prices were the product of ordinary, competitive market forces.

275. At the same time, Defendants publicly and repeatedly attributed their price increases to common external forces beyond their control. For instance,

276. Defendants' reliance on these external explanations provided a common narrative for simultaneous price increases and discouraged scrutiny into whether those increases were the result of coordination rather than independent decision-making.

277. As a result, Plaintiff and putative Class Members neither knew, nor in the exercise of due diligence could they have reasonably known, of the facts that form the basis for their claims. Thus, even if the discovery rule or equitable tolling were somehow inapplicable, Defendants should nonetheless be estopped from raising any statute of limitations defense.

## XI. ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

278. Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to HVAC Equipment;

B. The prices of HVAC Equipment have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Direct purchasers of HVAC Equipment have been deprived of free and open competition; and

D. Direct purchasers of HVAC Equipment paid artificially inflated prices.

279.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of HVAC Equipment. As a direct and foreseeable result, Plaintiff and the Class paid supra-competitive prices for HVAC Equipment during the Class Period.

280.   By reason of the alleged violations of the antitrust laws, Plaintiff and the Class sustained injury to their businesses or property, having paid higher prices for HVAC Equipment than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages.

281.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## XII.  CLAIMS FOR RELIEF

### COUNT 1
### Restraint of Trade in Violation of the Sherman Act § 1
### 15 U.S.C. § 1

282.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

283.   Beginning as early as January 1, 2020, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating

86

competition for the pricing of HVAC Equipment.

284. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

285. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for HVAC Equipment throughout the United States.

286. The conspiratorial acts and combinations have caused unreasonable restraints in the market for HVAC Equipment.

287. As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for HVAC Equipment.

288. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

    a.    Price competition in the market for HVAC Equipment has been restrained, suppressed, and/or eliminated in the United States;

    b.    Prices for HVAC Equipment sold by Defendants, their divisions,

subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

c.    Plaintiff and members of the Class have been deprived of the benefits of free and open competition in the purchase of HVAC Equipment.

289.    Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of HVAC Equipment to be higher than it would be but for Defendants' conduct.

290.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for HVAC Equipment than they would have paid and will pay in the absence of the conspiracy.

291.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment on his behalf and on behalf of the Class, by entering judgment as follows:

1)    Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2) Appointing Plaintiff as the Class Representative and his counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

3) Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

4) The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a per se violation of Section 1 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

5) Awarding Plaintiff and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

6)      Awarding Plaintiff and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

7)      Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiff and Class Members;

8)      Plaintiff and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

9)      Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

10)    Granting Plaintiff and the Class Members such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: May 11, 2026                    By: */s/ Nathan Fink*
                                                     David H. Fink (P28235)
                                                     Nathan J. Fink (P75185)
                                                     **FINK BRESSACK PLLC**
                                                     38500 Woodward Avenue, Ste 350
                                                     Bloomfield Hills, MI 48304
                                                     248-971-2500
                                                     dfink@finkbressack.com

nfink@finkbressack.com

Kimberly A. Justice
**JUSTICE JAGHER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (484) 243-6335
kjustice@jjlmlaw.com

William H. London
Michael E. Moskovitz
Samantha M. Gupta
Kara S. Smith
**JUSTICE JAGHER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
blondon@jjlmlaw.com
mmoskovitz@jjlmlaw.com
sgupta@jjlmlaw.com
ksmith@jjlmlaw.com

Jon A. Tostrud
Anthony M. Carter
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

Erik H. Langeland
**ERIK H. LANGELAND, P.C.**
733 Third Avenue, 16th Floor
New York, NY. 10017
Telephone: (212) 354-6270
elangeland@langelandlaw.com

91

*Counsel for Plaintiff and the Proposed Class*

92